AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means ❒ Original ❒

CLERK'S OFFICE
A TRUE COPY
Apr 30, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Records and information associated with the cellular device assigned call number numbers 414-595-2360 (the "Target Cell Phone"), that is in the custody or control of AT&T Wireless, as further described in Attachment A.

Case No. 25-M-414 (SCD)

Matter No. 2024R438

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______ District of ______
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 5-14-25 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Stephen C. Dries.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ______.

Date and time issued: 4-30-25. 3:55 pm

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular device assigned call number **414-595-2360** (referred to herein and in Attachment B as **"Target Cell Phone"**, that is in the custody or control of AT&T Wireless (referred to herein and in Attachment B as the "Service Provider" or "Provider"), a wireless communications service provider that is headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida 33408.

2. The **Target Cell Phone**.

**ATTACHMENT B**
**Particular Things to be Seized**
**MATTER NUMBER 2024R438**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone** for the time period from December 1, 2023, to present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **Target Cell Phone** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone**.

c. Information about the location of the **Target Cell Phone** for a period of **30 days**, during all times of day and night. "Information about the location of the **Target Cell Phone** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by

initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1), involving Russell V. MCDADE (m/b, XX/XX/1980) and other unidentified subject(s) since at least December 2023.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.

CLERK'S OFFICE
A TRUE COPY
Apr 30, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Records and information associated with the cellular device assigned call number numbers 414-595-2360 (the "Target Cell Phone"), that is in the custody or control of AT&T Wireless, as further described in Attachment A.

Case No. 25-M-414 (SCD)

Matter No. 2024R438

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ______ District of ______, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. 841 and 846 | Conspiracy to distribute and possess with the intent to distribute controlled substances<br>Distribution and possession with intent to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ______ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ALLISON MILLER (Affiliate) Digitally signed by ALLISON MILLER (Affiliate) Date: 2025.04.29 16:16:35 -05'00'

*Applicant's signature*

Allison Miller, TFO, DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 4-30-25

Stephen C. Dries

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT
MATTER NUMBER 2024R438**

I, Allison Miller, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call number **414-595-2360** (the "**Target Cell Phone**"), with listed subscriber unknown, whose service provider AT&T Wireless ("Service Provider") a wireless telephone service provider headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida 33408. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America

for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phone**.

4. I am employed as a detective with the West Allis Police Department (WAPD). I am currently assigned to the North Central HIDTA Drug Gang Task Force as a Task Force Officer for the Drug Enforcement Administration (DEA), Milwaukee District Office Group 68.

5. I have been employed by the WAPD as a full-time sworn law enforcement officer for over seventeen (17) years. I am currently primarily involved in the investigation of narcotics trafficking as well as individuals prohibited from the possession of firearms. These investigations consist of mid to large-scale drug traffickers operating not only in the City of Milwaukee and the State of Wisconsin, but also throughout the entire United States. I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, United States currency, and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am also familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and interviews and arrests of numerous drug traffickers.

6. Prior to my current assignment at North Central HIDTA Drug Gang Task Force, I spent approximately four years as an investigator in the West Allis Police Department Special Investigations Unit (SIU). Prior to being assigned to SIU, I spent two years in the West Allis Police Department Sensitive Crimes Unit (SCU). Since I became an investigator with the West Allis Police Department in 2016, I has been involved in numerous investigations involving sexual assaults, child abuse/neglect, deaths, and homicides also.

7. I have been a part of hundreds of state and federal investigations related to drug activity.

8. I have received extensive training on the investigation of narcotics, firearms, and human trafficking investigation and electronic evidence.

9. I have received training related to the investigations and enforcement of federal sex trafficking laws. As a result of this training and my experience, I am familiar with the technologies traffickers use to recruit, communicate with, and exploit their victims. These include posting online advertisements for commercial sex dates, communicating electronically with prospective commercial sex buyers, and distributing sexually explicit images and videos of trafficking victims. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices.

10. Additionally, I have received training related to the investigations and enforcement of drug trafficking laws. As a result of this training and my experience, I am familiar with the technologies of drug traffickers. I know that drug traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking

operations. I know drug traffickers often use electronic devices, such as cellular devices, to generate, transfer, count, record, or store the information described above and conduct drug trafficking. I am familiar with computers, cellular devices, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and fellow traffickers. I know that drug traffickers often keep documents and records about the transportation, sourcing, ordering, sale, and distribution of controlled substances. These documents and records and additionally receipts, notes, ledgers, and other documents regarding drug trafficking are often maintained where the traffickers have ready access. These may be stored computers, cellular devices, and other electronic media or electronic storage devices. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, and their drug proceeds. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and (2) the objects may have been used to collect and store information about crimes. I know the following information can be retrieved to show evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and

any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

11. I am familiar with the language used over the telephone and other electronic communications to discuss sex and drug trafficking and know that the language is often limited, guarded, and coded. I am familiar with various code names used to describe controlled substances, as well as various code words used to describe commercial sex acts. I also know that drug traffickers and sex traffickers often use electronic devices (such as computers and cellular phones), electronic communication services (such as e-mail and messaging services), and social media to facilitate these crimes.

12. Further, based on training and experience, I am aware that it is a common practice within a drug trafficking organization to have various tasks assigned to persons involved in the organization. The members of the organization may have certain tasks, dependent on their hierarchy within the organization. It is common for those in charge of the organization to use those below them to make deliveries, transport, and hold/take possession of items, such as controlled substances and/or narcotics for distribution or firearms for protection/intimidation. The persons higher in the drug trafficking organization often avoid conducting the hand-to-hand transaction in order to insulate themselves, to avoid apprehension/detection from law enforcement.

13. I have conducted investigations ranging from death, drug, property, and human trafficking crimes by analyzing cell phone data including tower usage, call activity, and cellular activity while trying to pinpoint certain locations of suspects and/or victims. I know that when

conducting an investigation into many drug investigations, and human trafficking investigations that the cellular phone data will be a key piece of evidence based on my training and experience. Individuals who sell and use narcotics and who engage in the trafficking of others will mainly utilize their cell phone to set up a transaction utilizing their cellular phone or a special application downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos. The same is true for those that engage in drug trafficking and human trafficking.

14. I have been trained regarding firearm offenses, drug trafficking and human trafficking, and have arrested individuals for these types of federal and state offenses. I have also investigated drug trafficking offenses at the state and federal level, including violations of Title 21, United States Code, Sections 841 and 846. I know from training and experience that those that commit crimes, including firearm offenses, drug trafficking and human trafficking commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

15. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map

patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

16. I have participated in the execution of numerous search warrants in which weapons, narcotics, and/or evidence of drug trafficking and human trafficking were seized in violation of state and federal laws. I am familiar with the different types and calibers of firearms and ammunition commonly possessed for illegal purposes, as well as the methods used to conduct narcotics trafficking and human trafficking. I have had a variety of formal, informal, and on the job training in the investigation of illegal firearms possession, firearms trafficking, drug trafficking, and human trafficking. Additionally, I am familiar with street name(s) of firearms, controlled substances and respective related topics, as well as has knowledge of the use of money laundering to conceal ill-gotten money.

17. Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

18. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

19. Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that possible crimes of distribution and possession with intent to distribute controlled substances and conspiracy to distribute and possess with the intent to distribute controlled substances Title 21, United States Code, Sections 841 and 846, have been committed by Russell V. MCDADE (m/b, XX/XX/1980) and other identified and unidentified subjects. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## II. JURISDICTION

20. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## III. PROBABLE CAUSE

### A. Background and Drug Death Investigation

21. On May 6, 2024, at 3:33 PM, West Allis Police Department (WAPD) officers were dispatched to the location of Sunrise Apartments, XX50 West National Avenue, Unit 401, for an individual not breathing. Upon arrival, officers located K.H. (DOB XX/XX/60) who was deceased inside of his apartment. Officers observed drug paraphernalia and a white powdered substance located next to K.H. inside of his bedroom.

22. The following items were located on the desk directly next to the deceased:

a. a glass plate with unidentified white powdery substance, located in bedroom on desk;
b. a glass crack pipe found in ashtray on desk in bedroom;
c. a glass crack pipe found near left hand of the deceased; and
d. a note from desk in bedroom with "RO **595-2360 (Target Cell Phone)**".

23. Case agents tested the round glass plate located near K.H. using Narcotics Analysis Reagent Kit # 20033 (Fentanyl Reagent). The test indicated the presence of fentanyl.

24. The nickname of "RO" is known to be used by Russell V. MCDADE (DOB XX/XX/1980) (MCDADE) (Figure 1), who has been identified as a drug dealer in the Milwaukee County area using telephone number of **414-595-2360 (Target Cell Phone)**. This information was established by Milwaukee Police Department (MPD) Officers Eric Rom and Chris Randazzo (ACISS Case Master Report #23-8906). Officer Rom and Randazzo confirmed this information through their investigation and surveillance.



Figure 1

25. Also located on scene was the following phones:

**a.** a black iPhone 8, located on the ground next to the body of the deceased in the bedroom, phone # 414-702-0461 IMEI 35 322010 047706 3;
**b.** a black "Blu" brand smartphone located on TV stand in bed room, found next to Blu battery. Battery was re-inserted into phone. IMEI 356862621691982, s/n 1050339022060916, Mickey Mouse sticker on back of phone; and
**c.** Black ZTE Qlink cell phone located on tv stand in bedroom, SN 320696644205.

26. The black iPhone 8 was the only phone that was on at the time officers found

K.H.

27. A cellphone extraction was conducted on the black iPhone 8 located on the ground next to K.H. Case agents reviewed the extraction and determined telephone number 414-702-0461 IMEI 35 322010 047706 3 appeared to be the black iPhone 8's most commonly and recently used by the deceased, K.H. From review of the contents of the iPhone 8, case agents identified several contacts and messages that were consistent with controlled substances conduct.

28. Case agents reviewed Facebook messages located on the iPhone 8. These messages were consistent with K.H.'s Facebook account. In reviewing the Facebook messenger conversations between K.H. and an account named "Bruno Giacomantonio" on the iPhone 8, case agents observed a message that seems to reference "Ro"(spelled Roe) and a drug transaction.

29. On March 19, 2023 at 8:09 PM, "Bruno Giacomantonio" sent a message reading, "Well roe is coming back out because he has to bring the other half." and "I could ask him to bring me there" at 8:10 PM K.H. responded "Sure I f you can". Bruno replies "Have you met his driver Susie yet" at 8:11 PM and K.H. responded "No I haven't". Bruno stated "Let me call roe and see where he is at" at 8:12 PM. At 8:45 PM Bruno stated "Just letting you know he said he is close." Based on training and experience, case agents believe this communication to be associated with arranging a drug transaction. The mention of "bring the other half" is in reference to the common weight of a "half gram" that drug users will order. The "other half" is often in reference to other drugs ordered. For example, a common order would be a "half of each" and this would reference a half gram of cocaine and a half gram of heroin / fentanyl.

30. Case agents reviewed the iPhone 8 for telephone number **414-595-2360 (Target Cell Phone)**. Telephone number **595-2360 (Target Cell Phone)** was in the iPhone 8 contacts as "Roros Latest Number".

31. Case agents reviewed text messages to and from telephone number **414-595-2360 (Target Cell Phone)** on the iPhone 8. K.H. appeared to have sent a text message to telephone number **414-595-2360 (Target Cell Phone)** on April 11, 2024, at 8:20 PM, which stated "Ken call can you give me a call when you get this message goodbye". K.H. also appeared to have sent an outgoing text message to telephone number **414-595-2360 (Target Cell Phone)** on April 12, 2024, at 2:59 PM, reading "Hey Roros Latest Number, I have auto $500 before and I'll pay this time again on the third." Telephone number **414-595-2360 (Target Cell Phone)** replied with a firetruck emoji and fire emoji on April 25, 2024, at 1:56 PM. On April 26, 2024, at 12:40 PM, K.H. sent telephone number **414-595-2360 (Target Cell Phone)** "Why was the 3 so small Last night it was like a 40" and at 12:41 PM also sent "Can you please give me a call when you get this message". Based on training, experience and the totality of this investigation, it is believed that these messages are referring to the purchasing of illegal drugs. For example, a fire emoji is often used to refer to heroin/fentanyl. Also, "…it was like a 40" would be consistent with drug weights. On April 28, 2024, at 4:21 PM KH appeared to have sent a message to telephone number **414-595-2360 (Target Cell Phone)** "Hey Aurora, give me a call when you get this message. This is K***** goodbye".

32. Case agents also viewed the call logs between the iPhone 8 and telephone number **414-595-2360 (Target Cell Phone).** There were numerous calls between the iPhone 8 and telephone number **414-595-2360 (Target Cell Phone)** on or about May 3, 2024. For

example, on May 2, 2024 at 11:31 PM the iPhone 8 had a missed call from telephone number **414-595-2360 (Target Cell Phone)** and a completed call lasting 38 seconds at 11:32 PM.

33. On May 3, 2024, at 12:28 AM the iPhone 8 received an incoming call from telephone number **414-595-2360 (Target Cell Phone)** lasting 3 minutes. At 1:25 AM, the iPhone 8 made an outgoing call to telephone number **414-595-2360 (Target Cell Phone)** lasting 45 seconds. At 1:30 AM, the iPhone 8 made an outgoing call to telephone number **414-595-2360 (Target Cell Phone)** lasting 16 seconds. At 1:52 AM, the iPhone received an incoming call from telephone number **414-595-2360 (Target Cell Phone)** lasting 2 minutes. At 2:20 AM, the iPhone 8 made an outgoing call to telephone number **414-595-2360 (Target Cell Phone)** lasting 27 seconds. At 2:24 AM, the iPhone 8 received an incoming call from telephone number **414-595-2360 (Target Cell Phone)** lasting 13 seconds. Then at 2:39 AM, 2:40 AM (twice), 2:41 AM (twice), 2:43 AM, 2:45 AM, 2:48 AM, 2:52 AM, 2:53 AM, 2:55 AM, and 2:59 AM iPhone 8 had missed calls from telephone number **414-595-2360 (Target Cell Phone)**. Then on May 3, 2024 at 2:59 AM, the iPhone 8 made an outgoing call to telephone number **414-595-2360 (Target Cell Phone)** lasting five minutes. Following this 2:59 AM call, there are no further calls to or from telephone number **414-595-2360 (Target Cell Phone)**. Further, after the call with telephone number **414-595-2360 (Target Cell Phone)** on May 3, 2024 at 2:59 AM, all calls on the call log are listed as missed. Therefore, the last completed call and last outgoing communication on K.H.'s iPhone 8 was the five-minute call to telephone number **414-595-2360 (Target Cell Phone)**, on May 3, 2024 at 2:59 AM. Based on training, experience and the death investigation into K.H., this would be consistent with K.H. likely passing away after this call.

34. The iPhone 8 had a long list of missed calls, dating from May 6, 2024 all the way back to May 3, 2024. Case agents obtained a Cellebrite phone extraction of the iPhone 8 showing the last contacts and the final answered call with telephone number **414-595-2360 (Target Cell Phone)** (screen shot Figure 2):

| | | | |
|---|---|---|---|
| **From:** +14145952360 Roros Latest Number | 5/3/2024 2:24:08 AM(UTC-5) | 00:00:13 | Answered |
| **From:** +14145952360 Roros Latest Number | 5/3/2024 2:24:03 AM(UTC-5) | 00:00:18 | |
| **To:** +14145952360 Roros Latest Number | 5/3/2024 2:20:07 AM(UTC-5) | 00:00:27 | Unknown |
| **To:** +14145952360 Roros Latest Number | 5/3/2024 2:19:57 AM(UTC-5) | 00:00:36 | |
| **From:** +14145952360 Roros Latest Number | 5/3/2024 1:52:59 AM(UTC-5) | 00:02:21 | Answered |
| **From:** +14145952360 Roros Latest Number | 5/3/2024 1:52:42 AM(UTC-5) | 00:02:37 | |
| **To:** +14145952360 Roros Latest Number | 5/3/2024 1:30:09 AM(UTC-5) | 00:00:16 | Unknown |
| **To:** +14145952360 Roros Latest Number | 5/3/2024 1:30:01 AM(UTC-5) | 00:00:24 | |
| **To:** 4148858736 | 5/3/2024 1:27:17 AM(UTC-5) | 00:00:23 | Unknown |
| **To:** +14148858736 +1 (414) 885-8736 | 5/3/2024 1:26:44 AM(UTC-5) | 00:00:55 | |
| **To:** +14145952360 Roros Latest Number | 5/3/2024 1:25:49 AM(UTC-5) | 00:00:45 | Unknown |
| **To:** +14145952360 Roros Latest Number | 5/3/2024 1:25:39 AM(UTC-5) | 00:00:54 | |
| **From:** +14145107909 Skips New And Latest Number | 5/3/2024 1:02:33 AM(UTC-5) | 00:00:12 | Answered |

(Figure 2)

35. Case agents also observed two phone contacts between K.H.'s iPhone 8 and telephone number 414-885-8736 on May 3, 2024, in between calls with telephone number **414-839-2402 (Target Cell Phone)**. Telephone number 414-885-8736 was not saved as a contact in the iPhone 8. Case agents observed that on May 3, 2024 at 1:27 AM there was an outgoing call from the iPhone 8 to telephone number 414-885-8736. The call lasted 23 seconds. Case

agents reviewed Cash App which indicated telephone number 414-885-8736 was associated with an account under the name Kerry Howell.

36. Case agents were aware that on May 3, 2024 at approximately 2:21 AM, K.H. was involved with a traffic stop with the WAPD and Kerry Howell Sr, DOB XX/XX/54 was also in the vehicle during the stop. (WAPD Case # 24-016978). WAPD stopped a 2015 red Ford Edge with Wisconsin license plate NL4442 (Edge). K.H. was the rear passenger inside the Edge and Howell was the driver and registered owner of the Edge. Howell was arrested for possession of 0.12 grams of crack cocaine. The traffic stop took place in the parking lot of Sunrise Apartments (XX50 West National Avenue, West Allis, Wisconsin), near the location where K.H. lived and was found deceased.

37. The Milwaukee County Medical Examiner later determined K.H.'s final cause of death was due to mixed drug toxicity, fentanyl and cocaine.

**a. MCDADE's and Kerry Howell's connections**

38. Case agents are aware from review of police reports, that MCDADE had previously operated Howell's Edge (WAPD # 23-033313). The reports indicated that on August 25, 2023, Detective Troy Maas observed the Edge traveling westbound on West National Avenue, in the 5800 block of West Allis, Wisconsin. The Edge was previously identified as a vehicle being observed doing hand to hand drug activity in West Allis. WAPD stopped the Edge, and the sole occupant/driver was identified as MCDADE. Detective Maas reported that MCDADE had three cellular telephones, a large amount of US currency, but no narcotics were located inside the vehicle. Detective Maas also reported that MCDADE has a history of selling narcotics. MCDADE was issued a citation for operating after suspension.

39. Based on training and experience, case agents are aware that those engaged in drug trafficking often carry several cell phones and cash from drug sales. The purpose of having several phones is done for several reasons. One reason is to separate their personal phone from the drug phone, which is often called a "dope phone", so as to deter law enforcement from connecting a phone which is used for the illegal activity of trafficking drugs to a person. The other reason for having multiple phones is to diversify the ability to serve the customer base, at times one phone might be given to a runner and if one phone is lost, either to law enforcement investigations or for some other reason there are other phones to fall back on for business to continue. Large amounts of cash are the result of the fact that drug sales are commonly a cash business as it is difficult to track the history of transactions when using cash, in addition to the fact that many street level consumers of drugs do not have other means to pay.

40. Case agent also reviewed MPD Officer Matthew Brooks from Special Investigations Division report, which demonstrated connections between MCDADE and Howell's Edge (ACISS Case Master Report #23-8906). On January 1, 2024, while on surveillance, MPD officers observed MCDADE at XX27 C. South 26th Street, Milwaukee, Wisconsin. Officers also observed Howell's Edge. During this surveillance MCDADE made contact with the Edge in the rear alley of the address at 8:25 AM.

41. Case agents obtained call detail records for telephone number **414-595-2360 (Target Cell Phone)**. Case agents observed approximately 40 phone calls that took place between **414-595-2360 (Target Cell Phone)** and telephone number 414-885-8736 (number associated with Kerry Howell) on May 3, 2024 (Figure 3). From review of Howell's traffic stop that took place on May 3, 2024 and the immediate phone contact with telephone number

**414-595-2360 (Target Cell Phone)** after the arrest of Kerry Howell with K.H., it appears that K.H.'s contact with Howell and his Edge was likely a delivery made in conjunction with the owner of telephone number **414-595-2360 (Target Cell Phone)**. This is further supported by MCDADE's past traffic stop and connections with the Edge and MCDADE's connection to telephone number **414-595-2360 (Target Cell Phone).** The circumstances are consistent with the behavior described above regarding the different role individuals maintain in a drug trafficking organization.

| | | | | |
|---|---|---|---|---|
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T02:55:45Z | 2024-05-03T02:55:45Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T03:53:18Z | 2024-05-03T03:53:46Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T05:00:58Z | 2024-05-03T05:01:10Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T05:51:49Z | 2024-05-03T05:52:01Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T07:21:35Z | 2024-05-03T07:21:42Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T07:24:25Z | 2024-05-03T07:24:35Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T07:35:00Z | 2024-05-03T07:35:27Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T07:40:22Z | 2024-05-03T07:40:30Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T07:46:04Z | 2024-05-03T07:46:13Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T07:50:43Z | 2024-05-03T07:50:50Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T07:52:17Z | 2024-05-03T07:52:35Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T07:54:12Z | 2024-05-03T07:54:23Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T07:55:21Z | 2024-05-03T07:55:26Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T07:58:14Z | 2024-05-03T07:58:14Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T08:29:11Z | 2024-05-03T08:39:17Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T09:24:02Z | 2024-05-03T09:24:21Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T13:12:42Z | 2024-05-03T13:15:01Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T13:36:53Z | 2024-05-03T13:37:00Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T13:43:21Z | 2024-05-03T13:43:43Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T13:50:06Z | 2024-05-03T13:50:12Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T14:01:07Z | 2024-05-03T14:01:37Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T16:16:19Z | 2024-05-03T16:17:02Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T16:37:06Z | 2024-05-03T16:37:18Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T17:44:16Z | 2024-05-03T17:44:19Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T17:45:43Z | 2024-05-03T17:46:48Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T17:48:32Z | 2024-05-03T17:48:43Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T19:17:20Z | 2024-05-03T19:17:20Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T19:20:34Z | 2024-05-03T19:21:02Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T19:41:10Z | 2024-05-03T19:41:34Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T19:45:23Z | 2024-05-03T19:45:28Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T19:46:03Z | 2024-05-03T19:46:03Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T19:46:07Z | 2024-05-03T19:48:03Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T20:10:28Z | 2024-05-03T20:10:28Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T20:10:51Z | 2024-05-03T20:11:15Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T20:21:54Z | 2024-05-03T20:21:54Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T20:51:08Z | 2024-05-03T20:52:52Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T20:54:22Z | 2024-05-03T20:56:37Z |
| 4145952360 | Outgoing | 14148858736 | 2024-05-03T21:04:26Z | 2024-05-03T21:05:18Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T22:57:42Z | 2024-05-03T22:58:30Z |
| 4145952360 | Incoming | 14148858736 | 2024-05-03T23:53:48Z | 2024-05-03T23:54:28Z |

(Figure 3)

**B. Recorded Jail Calls**

42. As part of the investigation into the overdose death and telephone number **414-595-2360 (Target Cell Phone)**, case agent began to review recorded jail/prison calls that were made from different jail facilities to telephone number **414-595-2360 (Target Cell Phone)** and

other numbers later identified likely being used by MCDADE, like telephone number 414-839-2402. Below is an outline of some of the jail calls reviewed by case agents. The calls were consistent with MCDADE engaging in drug and sex trafficking.

43. Generally speaking, where "MCDADE" is identified as the speaker, case agents believe this based on the totality of the jail calls reviewed, including the nicknames discussed, content of the jail calls, and voice of the speaker. Further, case agents were aware that Federal Bureau of Investigation (FBI) Task Force Officer (TFO) Andrew Langer has had many prior interactions with MCDADE and is familiar with MCDADE's voice. Case agents provided TFO Langer a copy of jail call 578328615_487029_07-08-2024_14-41-08_1-414-595-2360_8716 from July 8, 2024. TFO Langer reviewed the call and identified the male voice in the recording as MCDADE. The voice in jail call 578328615_487029_07-08-2024_14-41-08_1-414-595-2360_8716 from July 8, 2024 is consistent with the voice in the other jail calls identified as being MCDADE.

44. Case agents observed that there were numerous calls from the personal identifying number (PIN) of an in-custody female named Stacey L. Berry (f/w, XX/XX/1988). Berry was initially housed at Milwaukee Secure Detention Facility (MSDF) and then was moved to Taycheedah Correctional Institution. During the jail calls to telephone number **414-595-2360 (Target Cell Phone)** the caller generally addressed the female as "Stacey." Also, the female in the calls identified the male answering telephone number **414-595-2360 (Target Cell Phone)** as "Ro." At times there were calls made using other female inmates' PIN, but case agents determined the caller was likely Berry based on review of numerous other jail calls from Berry and the content of the jail calls, as further described below. From training and experience,

case agents are aware that individuals in custody will often use other inmates' PINs to complete phone calls. This is done to evade law enforcement, but also due to lack of ability to use their own PIN to make calls.

45. Case agents listened to a jail call from June 24, 2024, from MSDF using Mikayla M. Korman's PIN to telephone number **414-595-2360 (Target Cell Phone)** (572427371_711404_06-24-2024_10-06-53_1-414-595-2360_4722). This call begins with the female believed to be Berry, due to the voice being consistent with other recordings case agents reviewed of Berry's jail calls. The female addresses the male caller "Ro" and the male caller's voice is consistent with other recordings case agents reviewed and determined to be MCDADE. MCDADE then stated you get your money "Stacey"? Berry and MCDADE discussed money being placed on her books and that she will be moving to Taycheedah in a few days, "Wednesday." Case agents reviewed law enforcement records, which indicated Berry was transferred from MSDF to Taycheedah Correctional Institute on Wednesday, June 26, 2024.

46. In the same jail call, MCDADE stated that Berry should send a Marcus[1] order to him. Berry explained to a female that then comes onto the phone that all the charges in Fond du Lac were dismissed. Berry explained that the possession of cocaine "crumb" was "0.0" and lucky they didn't find the "Fent". Case agents confirmed through Wisconsin Circuit Court Access records that Berry did in fact have Fond du Lac County Case 2024CF436 dismissed June 7, 2024, which included a possession of cocaine offense. Case agents reviewed reports regarding this arrest (Fond du Lac Report # SO2403340) and all the details relayed by Berry

[1] Case agents are aware the Marcus is a company that provides services in the jail.

were consistent with this arrest. In review of the reports, case agents also learned Howell was the driver of the vehicle Berry was inside of. The vehicle was the Edge, which MCDADE also associated with, as outlined above.

47. Berry spoke again about leaving for Taycheedah on Wednesday. Case agents then heard MCDADE, but the phone appeared to be on speaker, as there was an audible female voice. The female stated that she was getting a phone for her birthday and that she will be online. Berry replied that she wants to get set up on "Paperdolls". Case agents reviewed the "Paperdolls" website and discovered it was a website for females in jail to date through writing letters. Berry stated that she was "going to get a whole bunch of tricks." Based on training and experience, case agents are aware the term "tricks" is used for customers that exchange money for sex. MCDADE asked Berry if she gained weight and she stated that she is up to 160 lbs. MCDADE answered that he did not believe that. Berry talked numerous times about how she was gaining weight and looked better. MCDADE and Berry spoke about different people they believed may be a "snitch ass bitch." Berry asked, "did you pay dude to put money on my books...." and MCDADE explained that this person spoke to him about if he was hiring. Berry then interjected that he is legit getting "Air B-N-B's" in his name for "old girl" and she "been selling pussy dog". Based on training and experience, case agents are aware the phrase, "selling pussy" is used to describe individuals engaged in sex for money. Berry stated, "Yes, bro he legit he got everything valid". MCDADE asked if this is "Danny's" boyfriend and Berry answered that it is actually a boyfriend of a girl named "Mikayla" and Danny's roommate. Berry stated that she was with her last September and said, "she sell pussy my nigga we gotta put her on a team, I need a whole house when I get out." MCDADE responded, "Man you gotta

stop talking like that over that phone." Berry stated that no one has any reason to listen to her calls. Based on training and experience, case agents are aware that the term "team" is often used by human traffickers to describe a group of victims the trafficker has engaged in sex for money. Further, that those engaged in human trafficking will at times obtain a location to house the victims and have the victims engage in sex for money.

48. At the end of the call, it appeared that MCDADE was on speaker phone and on another call. MCDADE directed a male to wait for him as he at the gas station. Berry stated that she cannot wait to get home and get some money. MCDADE stated that "CeCe (or Fee Bee) stay downstairs from Slim's old girl now" and Berry responded, "on 21". MCDADE stated "we got that house," to which Stacey responded, "that is right off National too." The call then ends abruptly.

49. July 2, 2024, jail call from Berry's PIN to telephone number **414-595-2360 (Target Cell Phone)** at 2:47 PM (575812203_487029_07-02-2024_14-47-45_1-414-595-2360_8713) from Taycheedah Correctional Institution. This call began with the female stating that the call was from "Stacey" and a male voice (identified as MCDADE) addressing the caller saying "Stacey". There was conversation about mail that was being sent to MCDADE and money to be placed on Berry's books. Berry requested that MCDADE call the number 414-559-4459 and meet with "Ron" to put money on her books. MCDADE appeared to then place a call, using another phone. The other call appeared to be placed on speaker phone so that the caller could be heard on the recording. MCDADE left a voice mail for "Ron" and stated "Ron, this Ro Ro is about sending Stacey money". It appeared MCDADE ended the call with the other phone and continued to speak with Berry. Berry discussed "Lisa" who she believed was

going to put money on Berry's books. MCDADE stated to Berry to stay on the phone as he is going to call this female Lisa. Berry responded "OK…these hoes don't want to move unless you give em some crack…that's all they want." The conversation then turned again to getting mail and money being placed on the books and the call abruptly ends at approximately five minutes into the call.

50. July 8, 2024, jail call from Berry's PIN to telephone number **414-595-2360 (Target Cell Phone)** at 2:41 PM (578328615_487029_07-08-2024_14-41-08_1-414-595-2360_8716) from Taycheedah Correctional Institution. This call begins with the female stating that the call was from "Stacey" and MCDADE addressing the caller saying "Stacey". This conversation begins with MCDADE speaking with another female in the background asking "what's the weight on that?" MCDADE then spoke to Berry explaining that "Mikah" is here and told Berry to speak with her. MCDADE then appeared to hand the phone to "Mikah." Berry and "Mikah" spoke about how to place money on Berry's books. Berry explained how to get the money on her account and explained the fact that "Ro" has all her info and Department of Correction (DOC) number to add money to her books. MCDADE is then heard on the call again. MCDADE and Berry spoke about mail that has not been received. MCDADE provided the address of 712 South 21st Street again and Berry explained that she sent the mail to 6th Street. MCDADE responded that he needs to call "LoLee" insinuating "LoLee" is at the 6th street address. The call ended abruptly.

51. September 13, 2024, jail call from Berry's PIN to telephone number **414-595-2360 (Target Cell Phone)** at 5:28 PM: (607075543_487029_09-13-2024_17-28-54_1-414-595-2360_12408.mp3). MCDADE stated: "Its Stacey, take the phone over there to Sam".

There is then another male voice heard that Berry asks if it is "Herron"[2] and the male stated that it is. Berry stated that he should tell "Ro" that "Mica" only sent over $64 of the $100. Berry stated that she needs the order put in for her clothing tomorrow as well and she will call back at 9:30 PM tonight.

52. September 13, 2024, jail call from Berry's PIN to telephone number **414-595-2360 (Target Cell Phone)** at 9:43 PM (607238071_487029_09-13-2024_21-43-02_1-414-595-2360_8513.mp3). MCDADE answered and said, "What happening baby" MCDADE stated "Herron speak to my minion." The call then ended shortly after this.

53. September 20, 2024 jail call from Berry's PIN to telephone number **414-595-2360 (Target Cell Phone)** at 4:52 PM (610166337_487029_09-20-2024_16-52-13_1-414-595-2360_8514). Berry stated "Hi Ro how are you doing?" MCDADE replied with "Hello Stacey where are you?" Berry stated that she is prison and MCDADE stated that he is asking if she was moved to Metro yet? Berry stated that she has not moved yet and MCDADE stated "I got a lot going on Herron died yesterday."[3] MCDADE stated "He gone Stacey". Berry replied that he "Oded." Based on training and experience, case agents believe this would be consistent with drug slang for overdosed. MCDADE paused and stated "I don't know what he had, I don't know what the fuck happened dog".

54. MCDADE and Berry then spoke about the fact that there would be orders made soon and "Mica" is not making the orders. Berry advised MCDADE to make the order with

---

[2] "Herron" mentioned in these calls is believed to be Antoine Deshawn Herron (DOB XX/XX/1973), who was found deceased at 1512 South 21st Street, Milwaukee, Wisconsin on September 19, 2024. This is further described in the affidavit.

[3] [3] "Herron" mentioned in these calls is believed to be Antoine Deshawn Herron (DOB XX/XX/1973), who was found deceased at 1512 South 21st Street, Milwaukee, Wisconsin on September 19, 2024. This is further described in the affidavit.

brothers-in-law CashApp card online. Based on the conversation, case agents believe this conversation related to ordering jail clothing and items Berry needed for hygiene. Berry asked "where is the bitch Sabina at?" and followed up by asking if she gave him pussy yet. MCDADE responded that he didn't know where she was. Berry stated that she has a clean bill of health and is coming home. Berry at the end of the call stated that it is so sad about Herron. MCDADE stated call me later when you are going to play with yourself. Berry replied and that she did only an hour prior. The call then ended with Berry stating that he will not get any pussy if her canteen order is not made and the call ends shortly after.

55. October 4, 2024, jail call from Berry's PIN to telephone number **414-595-2360 (Target Cell Phone)** at 7:58 PM (616450829_487029_10-04-2024_19-27-07_1-414-595-2360_12409). MCDADE stated "Hello, What's Up". MCDADE appeared to begin to speak to someone else and state "Eight O'clock, don't let no body in line em up in the basement they don't need to hang in the hallway line their ass in the basement." MCDADE addressed Berry again; however, in the background a male voice can be heard telling people to line up. The unknown male stated "one line for girl and one line for boy and one line for both." MCDADE told Berry that it is "RoRo". Berry stated that he sounds different.[4] MCDADE appeared to attempt to call "Gigi" from another phone and it can be heard that the call goes to voicemail. The call ended after this attempted call. Based on training and experience, case agents are aware that the terms "boy" and "girl" are common slang words used by drug users and drug traffickers. "Boy" often refers to heroin and "girl" refers to cocaine. Therefore, it appeared MCDADE is

[4] Case agents also noted that MCDADE's voice did appear like he might have a cold.

providing instructions for people to form lines for users of heroin, users of cocaine and those that wish to purchase both heroin and cocaine. Further it appeared that MCDADE is directing others at the location, demonstrating he is likely in charge of the operation. Due to another jail call on October 3, 2024 reviewed by case agents, between Berry and Gigi, case agents believed that the trap house McDade is in charge of during the call is 1512 South 21st Street, Milwaukee, Wisconsin, which is located near Orchard and South 21 Street. This is based on review of jail calls and later a controlled buy at the location.

56. October 7, 2024, jail call from Berry's PIN to telephone number **414-595-2360 (Target Cell Phone)** at 4:50 PM (617811471_487029_10-07-2024_16-50-21_1-414-595-2360_8513). The conversation is a continuation of previous calls between Berry's PIN and telephone number **414-595-2360 (Target Cell Phone)** about a female named "Gigi." "Gigi" was supposed to assist with Berry's order for new shoes and clothing from Marcus. Berry spoke about her recent health issues and a biopsy that she had done. Most of this conversation is concerning the need for Berry to get an order made for clothing. Berry asked if he knows of a girl named "White Star." MCDADE stated that he does not know who that is. Berry stated that "she is in a wheelchair now cause they ran that bitch over." Berry then stated, "that bitch up here, I beat her ass last summer, I was about to make that bitch strip up and down National naked, ugly bitch, let me catch that bitch outside the infirmary I go to pay for that ho, on my mama I beating her ass." Berry asked if MCDADE has seen "Skinny Minnie" around. MCDADE stated that he has seen her around. Berry stated that she heard "Gigi" came to the house on Lapham or Orchard and she said "don't let me find out you are relocating" without telling her. Berry reminded MCDADE that she will be out in nine months. MCDADE said that

"Gigi" was scared when she came. Berry explained when she spoke to "Gigi" she said there were so many people in the house. Berry told "Gigi," "Bitch what do you think? we do this for real." Based on training and experience, case agents are aware that the residence that Gigi described entering and seeing multiple people inside of and being scared would be synonymous with a "trap house," previously described in this affidavit, due to the fact that there would be "security" present and multiple "drug users" all inside to hide from the possible law enforcement conducting surveillance.

57. Berry stated that if they cannot get ahold of this girl to put the money on the books she is going to "beat the brains out the bitch." Berry suggested they send "Sam" to beat her up as well. Berry and MCDADE spoke about their children. MCDADE mentioned that his son is locked up.[5] Berry stated that she is going to go lay down and MCDADE asks that she call him later in the evening.

58. October 13, 2024, jail call from Berry's PIN to telephone number **414-595-2360 (Target Cell Phone)** at 12:03 PM (620372685_487029_10-13-2024_12-03-52_1-414-595-2360_8515). MCDADE stated, "Hello, what's up". They again speak about "Gigi" and MCDADE stated that he received a receipt from "Gigi" for the money placed on her books. Berry asked if MCDADE would help Berry's mother with rent because she is struggling. MCDADE stated he will help, and that Berry should tell her mother to call him and he will get her a TV as well. Berry is very excited to have been able to speak with her son. Case agent heard MCDADE appear to speak to a female in the background. MCDADE stated "What you

[5] Case agents reviewed law enforcement databased and determined Russell V. MCDADE Jr., DOB XX/XX/2003, who is believed to be MCDADE's son was in custody at the time of the jail call.

want one or two?" The female voice stated "I'll just take one" and then MCDADE replied "you know how much powder it is, you know how much soft it is, you want two". Based on training and experience, case agents are aware that drug traffickers use the slag term "soft" to refer to powdered cocaine. Further, based on the statement made by MCDADE, case agents believe he is discussing the quantities, either one gram or two grams of powdered cocaine. Immediately after this interaction between the other female and MCDADE, Berry stated to him that her letter sent to 712 South 21 Street got sent back as the wrong address. MCDADE stated "1512 South 21 Street" is the correct address. Berry asked if this is the new address, and he affirmed that it is the correct address. Berry stated MCDADE is supposed to get in touch with "Stephanie." Berry then laughed and relays a story about how Stephanie's mother said that MCDADE pulled out three big stacks of money when she went to see him. MCDADE stated that he didn't like her and denied that he asked her out to dinner as Berry alleged she was told. Before the end of the call Berry gave MCDADE her mother's number 406-3900 and added that it is an old drug dealer number so it is easy to remember.

59. December 1, 2024, jail call from Berry's PIN to telephone number **414-595-2360 (Target Cell Phone**) at 9:10 AM (643701619_487029_12-01-2024_09-10-50_1-414-595-2360_4906). There are two main themes of conversation. Berry is concerned with "Ro" (MCDADE) getting money to her mother to be put on her books. There is also a conversation about how Berry's mother called MCDADE's phone and it was answered by someone else. The other person spoke vulgar to Berry's mother. MCDADE stated that on Thanksgiving he left his phone with "Trevon" and "Mike" and that must be who spoke vulgar. Berry stated MCDADE should call Berry's mother while they are on the phone. MCDADE then appeared

to make a three-way call with Berry's mother "Tammy." They spoke about the vulgar phone call together during this time. MCDADE directed "Tammy" to come to "21" at approximately 3 or 4. MCDADE indicated he would run out to the car himself. Tammy complained that this is what she has been told in the past and she gets pushed back to a later time. MCDADE stated "you know how the game goes" you leave your phone laying around. Tammy stated that she does not let anyone touch her own phone. MCDADE stated it was not him who spoke vulgar. MCDADE stated he does not do things like that because he is a boss. Berry suggested that MCDADE gives his iPhone number to her mother. MCDADE stated that this is fine and stated the telephone number "839-2402," which was believed to be another drug line used by MCDADE. They then spoke further about the vulgar phone call. MCDADE stated that he is trying to give "Trevon" some leeway because "Herron[6]" died. MCDADE stated that this will stop. At this point they spoke about a car that is for sale and MCDADE stated that he will buy the car today. MCDADE asked Tammy to text his iPhone her address so he can look at the car. The call then ended.

60. December 9, 2024, jail call from Berry's PIN to telephone number 414-595-2360 (**Target Cell Phone)** at 12:21 PM (647289005_487029_12-09-2024_12-21-08_1-414-595-2360_4905). MCDADE answered "What's up Stacy". Berry stated that she just called the other phone twice, but he did not answer. MCDADE explained that he is on the other phone right now. Berry continued to speak about getting her order. Berry asked about another order and if he gave her mother more money. MCDADE said that he just saw Berry's mother and tried to

[6] "Herron" mentioned in these calls is believed to be Antoine Deshawn Herron (DOB XX/XX/1973), who was found deceased at 1512 South 21st Street, Milwaukee, Wisconsin on September 19, 2024. This is further described in the affidavit.

give her money but she did not want the money. MCDADE said that "she was tired and wanted to get herself some dope." Berry continued to speak about the next order and MCDADE said that her mother was at the house at around 3 am. MCDADE said that he was speaking on the other phone with Ava. MCDADE asked twice if Berry wished to speak to Mike. MCDADE appeared to hand over the phone and said "It's your wife." The second time Berry said she would speak with him and they speak for much of the remainder of the call. Berry stated that she thinks Mike sounds high. Mike stated that he is hanging out in the basement of the residence. Based on case agents' training and experience, Berry's statements as to the "other phone" would be consistent with MCDADE having more than one cellphone.

**C. Investigation into McDade's Stash House 1512 South 21st Street (Orchard Street)**

61. On October 24, 2024, case agents conducted surveillance at the address of 1512 South 21st Street, Milwaukee, Wisconsin, which case agent identified as a location for MCDADE's illegal operation. Case agents observed four individuals entering the front door at 1512 South 21st Street, Milwaukee, Wisconsin. Case agents identified MCDADE as one the individuals. Case agents identified Walter RINGERSMA (DOB XX/XX/1995) as another individual through a Wisconsin DOT photo.

**D. Additional Law Enforcement Investigation Regarding MCDADE**

**a. West Milwaukee Police Department Drug Trafficking Investigation Regarding MCDADE**

62. Case agents were made aware of a drug investigation in West Milwaukee related to telephone number **414-595-2360 (Target Cell Phone)**.

63. On August 15, 2024, case agents reviewed information from the West

Milwaukee Police Department that officers were called to the address of 5027 West National Avenue, West Milwaukee, Wisconsin and met with case worker B.K. Case worker B.K. relayed that there was a client of hers, H.S., that indicated he had fallen into a drug debt with a male named "Ro" for crack cocaine and was no longer able to pay his rent. B.K. stated H.S. gave her the telephone number **414-595-2360 (Target Cell Phone)** to speak with "Ro." B.K. contacted telephone number **414-595-2360 (Target Cell Phone)** and a male indicated he would meet with her to pay portions of the rent for her client. B.K. stated that this male who identified himself as a relative to her client also offered to become a payee for her client. Case worker B.K. stated that this particular client is severely cognitively disabled and is currently in the process of being assigned a payee.

64. B.K. stated that she did not meet with "Ro" as he never showed up to make the payment as he arranged. B.K. also stated that "Ro" has not spoken with her further concerning another arrangement to pay.

**b. MPD Drug Trafficking Incident**

65. On March 19, 2025, MPD was called to Best Western Plus near the Airport in Milwaukee, Wisconsin. MPD recovered 2,310 grams of suspected cocaine in a hotel room. Officers determined the room was rented by Walter RINGERSMA, who was later arrested in the hotel bar and grill area. On RINGERSMA's person was 1.27 grams of suspected cocaine. A female, Laura Francis Knezic (DOB XX/XX/1981) was also arrested related to the cocaine seized in the hotel room.

66. Case agents reviewed jail calls from Amber Valadez's PIN at Taycheedah Correctional Institute from March 25, 2025 at 7:12 PM to telephone number 414-514-3794

(695974289_553878_03-25-2025_19-12-35_1-414-514-3794_8803). During the jail call Amber Valadez identifies herself to a male using telephone number 414-514-3794. In review of the jail call, case agents believe the male to be MCDADE based on the content of the jail call and review of numerous other jails calls to MCDADE. Further, case agents also located 11 previous jail calls from Valadez's PIN to telephone number **414-595-2360** (**Target Cell Phone**). Case agents reviewed all 11 recorded jail calls and confirmed that they are all the same female's voice and the voice of MCDADE. Valadez is referred to as "Sabina" throughout many of the calls.

67. During the March 25, 2025 jail call, MCDADE stated that he has lots going on. MCDADE stated that "Wally got caught with 2 books". Based on training and experience, case agents know that it is common for drug dealers to refer to kilograms of controlled substances as books. Case agents believe MCDADE's reference to two books means 2 kilograms of drugs. Further during the call MCDADE clarifies that he was caught with "2 kilos." Valadez asked how this happened and if this was a traffic stop. MCDADE said that he (Wally) was "at the hotel with some people I know." MCDADE said that he was "going to be reimbursed in another hour or so" by some people he knows. MCDADE added that he is good. Valadez then tried to convince MCDADE to work on investing in automobiles so that MCDADE does not get in trouble. Valadez called MCDADE "Ro" during this call and spoke about her sister coming to get money to put on her books.

68. Based on the March 19, 2025 arrest of RINGERSMA with over 2 kilograms of cocaine and MCDADE's statements made during the record jail call on March 25, 2025, case agents believe MCDADE was supposed to be receiving the 2 kilograms of cocaine; however,

the police seized his drugs.

**E. Controlled Buys**

69. Based on training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as the CS-1, purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. The information provided by a CS was confirmed on the recording/monitoring equipment. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

70. In March 2025, case agents were notified of a confidential source (CS-1) that was purchasing controlled substances from "Roro" using telephone number **414-595-2360 (Target Cell Phone)**. CS-1 made recorded calls to telephone number **414-595-2360 (Target Cell Phone)** with the assistance of law enforcement to arrange the purchase of fentanyl from 1512 South 21st

Street, Milwaukee, Wisconsin. Case agents reviewed these recorded calls and were able to recognize that the voice of "Roro" as MCDADE.

71. On March 27, 2025 CS-1 called "Ro" at the telephone number **414-595-2360 (Target Cell Phone)** to arrange the controlled buy of fentanyl at 1512 South 21st Street, Milwaukee, Wisconsin. Case agents conducted surveillance and observed CS-1 arrive and enter the 1512 South 21st Street, Milwaukee, Wisconsin.

72. Once inside 1512 South 21st Street, Milwaukee, Wisconsin, CS-1 observed "Ro". CS-1 later explained that he/she provided "Ro" (MCDADE) with the buy money and MCDADE provided CS-1 with the suspected fentanyl. CS-1 stated that "Ro" then exited the residence.

73. Case agents observed MCDADE and Walter RINGERSMA exit 1512 South 21st Street, Milwaukee, Wisconsin. CS-1 also left the residence and met with case agents.

74. Case agents reviewed the audio/video recorder footage obtained by CS-1 and recorded surveillance during the controlled purchase. Case agents identified MCDADE's voice as the person CS-1 identified as "Ro" and MCDADE's voice was on the recording during the drug transaction with CS-1.[7]

75. The suspected fentanyl was brought back to the station where it was weighed, and field tested positive for fentanyl. The total weight was 4.03 grams.

76. CS-1 identified MCDADE as "Ro" using a booking photo.

**F. Service Providers**

77. Case agent reviewed law enforcement database, Lexis Nexis Law Enforcement

[7] During the controlled buy the recording device was in CS-1 pocket, so the video did not actual capture the buy. However, the audio did capture the buy, which was consistent with the description provided by CS-1.

Carrier lookup and determined telephone number **414-595-2360 (Target Cell Phone)** has AT&T as a service provider.

## IV. TECHNICAL BACKGROUND

78. Case agents believe from all the above information provided that MCDADE and others are involved in the distribution of illegal drugs. Case agents also believe that MCDADE is currently using telephone number **414-595-2360** (**Target Cell Phone)** in the course of his illegal activities, including communicating with known and unknown co-conspirators. Case agents further believe MCDADE has made and will continue to make frequent visits to locations in which he stores and distributes narcotics. Case agents believe that the historical and prospective monitoring of the **Target Cell Phone'**s location will assist in identifying potential sources of supply, distributors, and locations associated with the DTO.

79. I believe **Target Cell Phone**, whose service provider is AT&T Wireless ("Service Provider"), a wireless telephone service provider, continues to contain valuable information that could be used as evidence for the possible crimes of distribution and possession with intent to distribute controlled substances and conspiracy to distribute and possess with the intent to distribute controlled substances Title 21, United States Code, Sections 841 and 846.

80. Based on my training and experience, I know that Service Provider can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on Service Provider's network or with such other reference points as may be reasonably available.

81. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

82. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Cell Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## E-911 Phase II / GPS Location Data

83. I know that some providers of cellular telephone service, including Service Provider, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

84. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

85. I also know that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

86. Based on my training and experience, I know that Service Provider also can collect per-call measurement data, which Service Provider also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

87. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

88. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**Subscriber Information**

89. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phone** user or users and may assist in the identification of co-conspirators.

90. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phone**'s user or users, the locations of that user or users, and the patterns of that user or users. A frequency analysis of the telephone communications between MCDADE and other identified and unidentified subjects is material, in that it can establish whether the calls described above are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the cellular devices can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether MCDADE and others acted-in-concert, by establishing the nature and extent of their relationship, the existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

## V. AUTHORIZATION REQUEST

91. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

92. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

93. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

94. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until April 29, 2026, pursuant to the Omnibus Order signed by Honorable Judge Stephen C. Dries on April 29, 2025. This investigation is expected to remain covert at least until then, so disclosing the warrant would alert targets or subjects about the existence of a federal investigation. This investigation targets a sophisticated drug trafficking organization with multiple targets, subjects, and witnesses. Case agents will continue to request the same notification deadline for all warrants in this investigation, so that the notifications can be coordinated or extended as necessary. A single

notification date will reduce the administrative burden on case agents and the Court, minimize the risks of disclosure, and promote judicial economy. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

95. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

**ATTACHMENT A**
**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular device assigned call number **414-595-2360** (referred to herein and in Attachment B as **"Target Cell Phone"**, that is in the custody or control of AT&T Wireless (referred to herein and in Attachment B as the "Service Provider" or "Provider"), a wireless communications service provider that is headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida 33408.

2. The **Target Cell Phone**.

# ATTACHMENT B
## Particular Things to be Seized
## MATTER NUMBER 2024R438

### I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone** for the time period from December 1, 2023, to present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **Target Cell Phone** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone**.

c. Information about the location of the **Target Cell Phone** for a period of **30 days**, during all times of day and night. "Information about the location of the **Target Cell Phone** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to

determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1), involving Russell V. MCDADE (m/b, XX/XX/1980) and other unidentified subject(s) since at least December 2023.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.